Ladies and gentlemen, we have four cases on the calendar this morning, two patent cases and two veteran's cases, and one of the latter will be submitted only in the briefs and not be submitted in the briefs, and I have a proposal, and I understand Mr. Gunner will move the admission of a candidate to the bar of this court. May it please the court, I move the admission of Benjamin J. Kristoff. He's a member of the bar of the highest court of the state of Colorado. I have knowledge of his credentials and I'm satisfied that he has the necessary qualifications. Well, does the panel accept Mr. Gunner's representations? So far so good. We're happy to have him as a member of the court. Will he please stand up and take the oath from the clerk? I pledge allegiance to the flag of the United States of America and to the republic for which it stands, one nation, under God, indivisible, with liberty and justice for all. Congratulations, Mr. Kristoff, and good luck. Our first case is General Electric Company versus Thomas Wilkins and Mitsubishi, although Mitsubishi has dropped out. Case 2013-11-69-70-71, Mr. Gunner. May it please the court, at the outset I would like to note I am not relying on any testimony of Mr. Wilkins. The district court questioned his credibility and I do not need that testimony to make the point that the district court clearly erred in finding that Mr. Wilkins was not a co-inventor. You're relying only on documentary testimony which clearly proves that he's an inventor? I agree with the last half of your statement. The documentary testimony proves that he is a co-inventor, but I'm not relying only on that testimony. I'm relying on findings of fact of the district court and I'm relying on testimony from GE witnesses, not from Mr. Wilkins. Can I just get something out of the way, which I don't think is a problem, but I just want to confirm. Is it your understanding that because your counterclaim was a compulsory counterclaim that we have jurisdiction over this appeal? I agree, Your Honor. We wouldn't have jurisdiction just on GE's affirmative claim? I agree, Your Honor. That this is compulsory? Yes. I think a good starting point is the design and cost analysis of Mr. Wilkins, which was submitted in October 2002 and the district court had significant findings on that on pages A9 and 10, paragraphs 49 and 50. The district court found that this was a proposal of Mr. Wilkins. He found that it disclosed the UPS. He found that it powered all auxiliary systems. He found that it also powered essential electronic equipment. GE's expert witness, Dr. Kirtley, said at one point that the diagram in the design and cost analysis was not clear, but he admitted that it would have powered the converter controller, which was recited in Claim 15. He admitted that the text of that document describes essential electronic equipment and he made it clear that that included the components controlling the converters, the plate pitch control system, and the general controls of the wind turbine. Mr. Gunner, that's the only documentary evidence you're relying on for conception by Mr. Wilkins. Is that right? No, that is not so, Your Honor. I'm dividing my argument into two parts. One is the design and cost analysis, which I think alone makes the point, and then a second part of my argument is that there's document after document after document from GE proving that Mr. Wilkins contributed the UPS in combination with the other components. In the design and cost analysis, it doesn't really show that the UPS is powering the controllers, right? It does. The text describes expressly that it powers... I guess we're talking about the figure. In the figure? Yeah. It does. The figure does disclose that. There's testimony supporting the figure, and I started out by saying that Dr. Kirtley, GE's expert, said it wasn't clear. But we have testimony from other witnesses saying that GE fact witnesses confirmed that the blue brief 4546 has other witnesses, and Dr. Kirtley never said it didn't disclose it. He just said it wasn't clear, but then he was asked, what about the text? He admitted that the text supports the claimant language. The text has the same language that the district court used in the paragraphs I just read, essential electronic equipment, which includes all the controls, and that's all you need. It's clear why you're not relying on your inventor's testimony, because he was found by the district court to totally lack credibility. But didn't he testify that he wasn't an inventor? Your Honor, he didn't testify that he wasn't an inventor. His testimony was conflicting in various parts. GE argues that we should not be able to rely on his testimony, and we're not. The court made findings that he contributed the design and cost analysis, which discloses all the elements of Claims 1 and Claim 15. They did not challenge the district court's findings, and so whatever Mr. Wilkins said, and I agree, his testimony was not a model of clarity, which is why I'm not relying on it, not at all. Not a model of clarity. Well taken, Your Honor. What is the specific district court finding about the October 2002? It's in paragraphs 49 and 50 on pages 8, 9, and 10, and if you look at 49, it says October 29, Mr. Wilkins drafted and circulated a document entitled Design and Cost Analysis, and it says it represented his proposal for achieving LVRT, and then 50 says it embodied the use of a 50 kilowatt UPS, which is a large UPS to supply power to all auxiliary systems for 60 seconds, and then the essential electronic equipment for up to two hours. Dr. Kirtley admitted that that includes all of the key claim elements in Claim 1 and 15. If you look at his testimony, his testimony probably is best set forth at A333, pages 1323 to 1324. What about at the very end of Judge O'Neill's opinion at A18, where he concludes that there are no reliable documents that verify what, if anything, Mr. Wilkins contributed to any of the claims of the 985 patent? Doesn't that statement sweep in to Design and Cost Analysis? Your Honor, there are two answers to that. One is, if that statement was made, if you look at the preceding sentence, he's talking about the discussions between Mr. Lutzer and Mr. Wilkins, and I read that sentence to relate back to that earlier sentence, no reliable documents concerning those discussions. If it meant anything more, it is clearly wrong because the documents, there are so many documents, I barely know where to start in terms of, and including Mr., not only Mr. Lutzer, but the GE witnesses. You have the Mohamed document early December 2002, which was the first invention disclosure, which identified Wilkins as the only inventor. You have Mr. Fogarty's mid-December 2002. Both of these were based on the Design and Cost Analysis, both of them identifying Wilkins as the only inventor. I'm sorry, Mr. Dunner, could you repeat the name of the person before Mr. Fogarty? Mohamed. Mohamed. Mohamed? It's at 810, paragraph 59, and pages 3039 to 43. And Fogarty, I guess it's Dr. Fogarty, again named Wilkins as the only inventor and relied on the Design and Cost Analysis. Fogarty had a second ID in January 2003, again naming Wilkins as the only inventor. Moyles, Lisa Moyles, who was the GE in-house patent attorney, her initial assessment in December 2002. All of that, I think all of it, but in any event, almost all of it, is a set of documents reflecting GE's effort to start documenting the invention that it wanted to go and patent. I thought that the district court walked through these materials and essentially concluded that looking at them one by one, there isn't an underlying basis accurately applying the law of co-inventorship with separate investigation by the authors of these documents to add up to clear and convincing evidence from those post hoc investigations or summaries, maybe not with investigations, as a substitute for what would have been contemporaneous evidence that Mr. Wilkins himself was responsible for the conception of what we will assume is in the October 2002 design. Let me respond to that in multiple ways. First of all, the district court never applied the Design and Cost Analysis to the claims, never did it. He has in the sentence on page... of any aspect, in fact, in particular, the UPS powering aspect of what's in that design document. Let's assume that that is in the document and that that maps onto key elements of the claims. I'm now focused just on the question, the evidence for how we know that he conceived as opposed to borrowed from somebody else. Well, first of all, there is not a shred of evidence suggesting from all these documents from GE or from the witnesses that any GE witness came up with the idea of combining the UPS with these other elements in Claims 1 and 15. Not a shred of evidence. And so we have the Design and Cost Analysis, which the district court found was Mr. Wilkins' proposal, and ignoring his testimony, we have the testimony... and that's not consistent with the claim. Your Honor, I don't agree with you. I think that if you look at the testimony I cited you to, you will find... But we can read the diagram and we can read the claim. The claim requires the controller to be coupled to receive power from the UPS, whereas in the diagram I have, it's getting power from the grid and the UPS is a buffer to insulate the turbine from the grid. You're looking at the diagram in the Design and Cost Analysis? Yes. And in fact, that is the text, and Dr. Kirtley agreed that that provided support, power, from the UPS to the essential electronic equipment, and he said that included the controlling converters, the blade pitch control system, and the general controls of the wind turbine. And he said that at page 1323, line 11, to 1324, line 4, and the GE fact witnesses confirmed that on pages 45 and 46 of the blue brief. You are into your rebuttal time, which you wanted to save. Do you want to keep going or save it? No, I think I better save my rebuttal time. Thank you, Your Honor. Mr. Lee. May it please the Court. My name is Bill Lee, and together with my partner, Louis Tomfros, we represent General Electric. On appeal, Mr. Wilkins has two burdens. The obvious burden is to prove inventorship by similar convincing evidence. The second burden is to demonstrate that the factual findings made by Judge O'Neill were clearly erroneous. While I understand why Mr. Dunner would like to dismiss the credibility issues, it can't be done so easily, and Judge Toronto's question is the reason why. The idea, and I'll come to the design and cost document, which does not map to the claims, but setting that aside for a minute, the answer to Judge Toronto's question about what is the evidence, or what was the basis for claiming that Mr. Wilkins contributed the idea of an uninterruptible power supply, configured in the manner of claims 1 and 15, is Mr. Wilkins' testimony. And that was it. And that's why the district court's findings, we believe, were extraordinary. He found that Mr. Wilkins... documents, which had some investigation behind them. Why do those documents, together with the absence, and this is Mr. Dunner's other point, that there is a complete absence of any other evidence of who else contributed this idea, why do those two things together not amount to clear and convincing evidence that what is shown in the design document, on the assumption that it maps to the claims, was his? 2002, which demonstrates that before Mr. Wilkins arrived to discuss his ideas with the German team, they already had the specification, a specification that would map to the claims. So the idea, and Judge O'Neill heard this, the idea that no one else had this is simply not correct. Is one of the particular findings of fact that Judge O'Neill issued, does it say that? And that's the proof that he's referring to at that point. Now, I said there were three parts to the answer. So the predicate, which is the idea that there is no other proof of where these ideas came from, and in fact, as part of the GE investigation, which I'll get to next, there was a discussion of what was contributed by the Germans, what was contributed specifically by someone named Till Hoffman, and it was this specific crowbar circuit. And what Mr. Wilkins' idea was. Mr. Wilkins' idea, which is explicitly in Judge O'Neill's findings at, I'll get it for your honor, at finding 50, was a large uninterruptible power supply. And as the evidence demonstrated, the difference between the two is this is the difference between your worrying about powering your laptop if your house loses power. There are two ways to do it. One is you can have a backup battery for your laptop. The other is you can have a generator for your house, which will keep your whole house on line. What Mr. Wilkins' idea was, which was put into a separate patent application, was the generator for the house. If your honor considers the four goals of the invention that are articulated in the 985 patent at the outset, that wouldn't satisfy the fourth goal, which is to take some components offline. So Judge O'Neill specifically identified what Mr. Wilkins contributed. He also specifically talked about what came from the other parties in Germany, and Mr. Hoffman and Mr. Lutze specifically. Mr. Lee, what are we to make of the fact that the ITC-ALJ, and this hasn't been mentioned this morning by Mr. Donner, but certainly in his brief, determined that Wilkins was an inventor shown by clear and convincing evidence? Well, your honor, actually that is something that demonstrates why the district court here was correct. That was part of an inequitable conduct claim. But it was his determination. Yes. The argument that was made to the ITC on much, much less evidence, we had a six-day trial in this case, was that Mr. Wilkins had conceived of the invention in 1998 to 2000 in Lake Benton. The problem for Mr. Wilkins is when we had the trial in Fresno, the witnesses who were at Lake Benton came to testify. And they demonstrated that none of these were his ideas. So what happened? The invention, and this is part of what Judge O'Neill identified, the conception and the corroboration morphed. And it changed from 1998 to 2000 in Lake Benton to, I had a series of conversations and collaborations with the German inventors in 2000 and after. And that's when the invention took place. Well, Judge O'Neill went through all those emails, he went through all those discussions, and he said in paragraph 37, these were general discussions about low-voltage drive-through. Then the argument became in the middle of trial, well, there's corroboration of the invention. It's the design and cost document. There are three major problems with the design and cost document. The manner in which Mr. Wilkins characterized it in his brief, which is the district court finding that it was his invention, isn't what he found. What he said is, this is Mr. Wilkins' proposal for Florida Light and Electric. If the court considers the genesis of the proposal, which is at A2365-66, Mr. Wilkins was asked to collect the ideas of all the different engineers who've worked on this low-voltage drive-through process. Just on the question of what that proposal shows, is there a dispute that if you put aside the schematic, or read the schematic in light of that passage that Mr. Dunner was talking about, something 18, that's the sentence about how this is supposed to power all the essential elements or essential whatever the word was, that the UPS is in fact powering the controller elements during the downtime? There is, Your Honor, and let me finish the point. The first thing is, let's set aside what it shows, which I'll come to immediately. Even in their reply, they described that document as a collaboration, a proposal that's a collaboration. There's no indication of, and that's true, because the source of the document is the pages I just cited where he was asked to collect the ideas of many. In that proposal, there's no evidence, save for his not-credible testimony of what was his idea and what was someone else's idea. Now, if we get to the document, the answer to your question is no. It doesn't match the claims 1 and 15. And the best indication is that A599, Mr. Wilkins testified on cross-examination that the diagram and the document was a mistake. He was drafting too fast, he said. I'm sorry, just the schematic? He was focused on the schematic. Right, but Mr. Dunner, as I understand his position, he does have an argument that you can read the schematic where the blue box is sort of connected to the yellow on the right and not just to the red. Let's put that aside. His other argument is that even if the schematic is not right, that the sentence in the text indicates that this UPS is actually supposed to power the essential stuff, and the essential stuff is the controller, and it doesn't have to be everything in the claim, because joint inventors can contribute parts. Your Honor, there are two fundamental problems with that. The first thing is, that would be discord, finding that paragraph 50 was clearly erroneous. Because Judge O'Neill specifically found, having heard all the evidence on this design and control document, that his contribution is what is shown in the diagram and in the document. It was a 50 kilowatt UPS powering all the elements. Now, this all essential elements that Mr. Dunner referred you to, I think the page that they intended to refer you to is A833. Respectfully, it's not a fair argument. What the witness was asked is, are all of the components of a wind turbine... He was referring to a page in the document itself, A2318, in which the sentence says, then the UPS will be required to support essential electronic equipment with an estimated load of whatever. And, Your Honor, he then referred you to Dr. Kirtley's testimony, and if you go to A833, you'll find that essential elements are all the components that are required for the wind turbine to operate in normal operation. There's no distinction in that document or any other document which suggests that you would power only the converter controller, only the blade pitch controller, only the probar circuit, only the turbine controller. So the document has three major problems. One is, it is by definition the collaboration of several people, and there's no clear and convincing evidence as to what he contributed. The second is, he testifies that the diagram, which was the focus of their presentation, as opposed to this essential elements portion, was a mistake. And when he was asked, is there a document that shows a UPS, not the grid, powering the turbine controller, the converter controller, the blade pitch controller, the probar circuit, the answer was no. So there's no document at all. And then the third thing is this. There's a specific finding as to what he did contribute. We don't claim that he didn't make a contribution. We claim that his contribution, as Judge O'Neill found in paragraph 50, was the generator for the house to power all the essential elements of your house, everything that's working. And the best indication that that's in fact true is that after this process that GE went through, at the end of the day, they decided to have the 985 application, they drafted a separate application that described the 50 kilowatt UPS idea. It was never filed, in part because the evidence demonstrated it was never commercially viable. And in fact, Mr. Wilkins was asked, has anybody in the world, in the entire world ever used this idea? He said, not yet. And then there was a third patent, the 585 patent, in which Mr. Wilkins did make a contribution and after he left, he was named an inventor, and as the record demonstrated, it was the patent that GE at that time thought was going to be the commercially most significant, and he was named as inventor. So this process, to go to Your Honor's question about do these documents sort of supply the missing link, they don't for three reasons. One is that there was affirmative proof of who came up with these ideas, that Judge O'Neill heard. The second is- This is the Germans in paragraph 54. Yes, and they're both trying to get low voltage drive through down to 15%. They're doing it for two different utilities in parallel. And then at the end, and Judge O'Neill was not complimentary about the process that went into filing the applications, there's going to be a proposal made to Florida Power and Electric. They need to get the application on file. Mr. Mohamed was brought in, Judge Ken, because Mr. Wilkins had left, and they said have someone who knows something about what he did give some input. And then when you look at that set of documents, I'd make only these two points. The first is that this was a process where people were trying to get it right, and at the end, there's a conference call. Mr. Wilkins isn't participating because he left under unhappy circumstances, at least for him. And the end decision is file one application, the 985, because that's what the Germans did, file a separate application for Mr. Wilkins on his 50 UPS idea. And that's in fact what occurred. And I think that's the answer to your question. At the end of the day, and I know we disagree on this, I don't think you can just set aside the inventor's testimony or his credibility. We're not saying that if an inventor had died, you couldn't prove things independently. We would never say that. We're not saying that the inventor was not there, was unavailable, couldn't prove it. And in fact, the Court considers Judge O'Neill's opinion and what he said in the closing argument, which was I'm having trouble with Mr. Wilkins' credibility. Would you please tell me what there is independently? He said that to them. Mr. Lee, where can I find in the design and cost analysis the indication you were saying before that it shows that this was nothing more than a collection of multiple engineers' ideas? There are three places, Your Honor. If you look at page A2365-66, it is the email that describes the genesis of the design and cost control document. And it's asking Mr. Wilkins to collect the ideas of several engineers. And then if you consider, I think it's at the top of page 2 of Mr. Wilkins' reply, he describes it as a collaboration. The question then becomes what did he contribute? And the answer is at paragraph 50 of Judge O'Neill's, the 50 UPS interruptible power supply that would power everything. Thank you, Your Honor. Thank you, Mr. Lee. Mr. Donahue has some rebuttal time and will give you your full three minutes. Thank you, Your Honor. Mr. Lee said that finding 54 shows that the district court found that the German engineers made the invention before Mr. Wilkins. It does not. It says by late summer or early fall of 2002, the German engineers in Salzburg were already in the process of developing their own LVRT solution to meet the more stringent E-ON standards. It says nothing about UPS. There is not a single document, there's no testimony showing that they had in mind UPS before the design and cost analysis. That's point one. Secondly, Mr. Lee talked about different inventions, a large UPS versus a small UPS. The fact is that the claims say nothing about large or small. GE tried to get the district court to construe the claims narrowly. He refused to do it. And the spec not only has a figure three description of the small UPS, but it also describes a UPS designed to control other components and therefore is not restricted to a small or a large UPS. Lutz's testimony, I direct you to A611. He says that the conception is by Wilkins in the design and cost analysis. And there is no claim requirement for the UPS to power only controllers. Claim one calls for a pitch control system. You can compare it with claim 29 which talks about a pitch controller specifically. It is clear that the claims and the spec are not restricted to that. And the fact that UPS is significant is demonstrated by the fact that the examiner required them to add UPS to all the claims in order to get it allowed, UPS in combination with the other elements. And finally, the GE witnesses credited conception to Wilkins at page A757, page 1022, lines 2 to 13. Unless there are some questions from the bench, I think I've concluded my argument. Thank you, Mr. Donohue. We haven't lacked perfective wind energy this morning. We will take the arguments and take the case on the submission. I hope you're not describing our energy as full of wind.